Today is State of Duncan v. Commissioner of Internal Revenue. Good morning. My name is Anthony Didino. I represent the appellants in this matter, Jeanette Duncan and the estate of Robert Duncan. It was U.S. Supreme Court Justice Potter Stewart who first coined the phrase, quote, I know it when I see it. While that approach may be appropriate in answering questions of obscenity law, which is how Justice Stewart used it, it is not an appropriate approach in deciding how much a taxpayer can afford to pay the IRS in connection with a proposed settlement of its tax debts. Now, are we going back all through the years it took to try to deal with all the problems of the Duncan estate, or are we simply asked to decide whether or not the government can enforce and collect the taxes that they are now saying they owe or owe? You're correct, Your Honor. This case has quite the history. However, the single, or I should say the primary issue before this Court, is the IRS's determination on their offer and compromise, which was kind of the last stage. We're not deciding whether, what was it, how much did you offer? 4,000 or some little bit? Oh, I'm showing maybe my, that doesn't mean anything on the ultimate. But it seems to me like we're not deciding whether the figures the government's now talking about as versus the taxpayers, but simply whether or not the government now has proved enough, done enough, and is in a position to collect and enforce what they say is owed. I believe that's correct, Your Honor. Basically, what is the primary issue before this Court is not whether the Duncans owed a specific tax liability. It has to do with whether the IRS abused its discretion in choosing not to accept their offer and compromise status collectability. So we are here to ask this Court today to overturn the tax court's decision to sustain the IRS's denial of their offer and compromise, and to remand this case back to the tax court with instructions that the Duncans offer be sent to IRS appeals for proper evaluation. I'll focus my attention today on the IRS's conduct in evaluating and determining the offer and compromise, their offer to settle their past tax debts. The other issue and dispute in this case has been fully briefed. So when we're looking at the issue of whether the IRS abused its discretion and we're looking to evaluate the settlement officer's conduct, the appropriate benchmark is the Internal Revenue Manual. And we know this for two reasons. First, because the Internal Revenue Manual essentially tells us that. In Section 1.11.2.2, it states it is the primary official compilation of instructions to the IRS personnel. And that it is designed to ensure employees have approved policy and guidance they need to carry out their responsibilities in administering the tax laws. Translated, the Internal Revenue Manual exists to prevent IRS actions that are arbitrary, capricious, and without sound basis, which is the definition of an abuse of discretion. We also know that the Internal Revenue Manual is the appropriate benchmark in this case because the courts have time and time again used the Internal Revenue Manual to gauge the reasonableness of IRS conduct. And it's because of this precedent in the Internal Revenue Manual that the government concedes as it must that the Internal Revenue Manual is an appropriate benchmark in this case. So when we compare the IRS's actions... It seems to me the government's argument comes down at bottom to, you all made an offer, the Duncans made an offer, and the government was not required to counteroffer. And the initial offer was $40,000 to offset a $3 million-some-odd tax liability. $40,000 was just one component of their offer, Your Honor? And then later it was admitted that it was at least $500-some-odd, $7,000. And so the government's position is we shouldn't have to counteroffer and bid against ourselves in this situation. Now, what's the answer to that? So the Duncans submitted an offer in compromise with a reasonable collection potential, which is simply IRS lingo for their ability to pay $545,000. I thought they offered $40,000. It included a request, Your Honor, for special circumstances where they asked the IRS to further reduce the amount that they could afford to pay from $545,000 down to $40,000 based upon special circumstances. But that was simply an add-on feature of their offer. And we see evidence that it's an add-on feature in two ways. One, the Internal Revenue Manual. It states that where an offer includes special circumstances, if the IRS decides special circumstances do not exist, that the offer should still be considered based upon what the taxpayer contends is the amount that they can afford to pay, which is the $545,000 in this case. Secondly, what we see is how the settlement officer, Settlement Officer Taylor, evaluated the offer. It's clear that he was considering it based upon the Duncans' ability to pay. Had he simply determined special circumstances, it would not have been necessary for him to make as many requests as he did to make as many inquiries into the value of their assets. So in evaluating their offer, and again the offer of $545,000, which was again a component of their offer, the settlement officer was instructed by the Internal Revenue Manual to calculate RCP, Reasonable Collection Potential. What can the Duncans afford to pay? So he was charged with the task of evaluating that $545,000. The Internal Revenue Manual is clear. That's the starting point for working an offer in compromise. And the Internal Revenue Manual goes so far as to state that the decision to accept or reject an offer usually resides with the IRS's determination of Reasonable Collection Potential. The settlement officer in this case did not calculate Reasonable Collection Potential. His reasoning? Well, he offered two reasons, neither of which really have much merit. The first was that it was obvious to him that the Duncans could afford to pay the taxes. That's your quintessential I-know-it-when-I-see-it approach. Secondly, he decided that it was simply impossible because there were too many business interests that were family-owned with intercompany transactions. Wasn't there an issue about dissipation of large quantity of assets? There was an issue, Your Honor, and actually that's another issue. And how much was that? It was a lot of money, right? The settlement officer had placed a value of approximately $3 million in dissipation. However, that also represents a violation of Internal Revenue Manual procedures. He breached the standard of conduct of even considering dissipated assets. But whether that's right or not, I mean, I hear what you're saying, but how much was the dissipation of assets, mysterious disappearance of assets? And dollars. He assigned a value of approximately $3 million on it, Your Honor, but that value. I thought it was $8 million. The $8 million, Your Honor, has to do with a value that was set forth in an estate inventory. The IRS had concluded that the Duncans at some point in time had a net asset value of $8 million, and that was based upon an inventory that was filed in the probate court in January of 2003. However, that inventory only reported gross values. It did not report claims against the estate. And there were significant claims against the estate, liabilities, and we see that in the Form 706 that was filed with the estate. So as you can see, there was a number of errors committed here. The $8 million does not take into account approximately $3.7 million debt that existed against the estate. Going back to the issue of dissipated assets, the Internal Revenue Manual states that as a general proposition, that should not be considered. And there is a narrow exception to that general rule, but it only applies where an asset is transferred essentially for an improper purpose or use, and it occurs after the date the taxes have been assessed or six months prior. So there's the threshold condition that needs to be met before dissipated assets are appropriately considered. In this case, the settlement officer, in including over $3 million of dissipated assets, didn't identify a single specific transfer that he believed was an act of dissipation. Really, he simply looked at a general overall decline in value going all the way back to 2002, which is four years before the date of assessment, and comparing it to values in 2012. Further, and going back to the issue of how he calculated the $3 million, because he didn't identify a specific asset, there was no value that he could assign to it other than to basically take as a plug the amount of taxes that were the balance of the taxes due at the time he was considering the offer, which is that $3 million. So we see that there was really no methodology or rhyme or reason in including dissipated assets, and certainly it wasn't authorized under the rules and regulations of the Internal Revenue Manual. The second biggest area we really see a breach in the Internal Revenue Manual standards of conduct is settlement officers' failure to seek help on complex issues. The IRS recognizes that business valuations are complex, and so the Internal Revenue Manual includes several provisions where it instructs IRS agents to seek the help of specially trained experts employed by the IRS, where a valuation of a business is an issue in calculating reasonable collection potential. The IRM says that the settlement officer or the revenue officer should seek the help of an IRS valuation engineer. The IRM also provides that where a professional appraisal is submitted by the taxpayer in connection with an offer of compromise, that a referral to a field specialist must be made. It's mandatory. And yet Settlement Officer Taylor in this case, despite testifying that he was aware of these procedures and aware that these experts were available to assist him in this case, he chose not to make that referral. His reasoning? Because he concluded that it would not be necessary since it was obvious that the Duncans could fully pay their taxes. Again, I know it when I see it. Now, there's an irony in that because he also testified that this was by far the most complicated, complex offer that he had ever worked. Now, in going at attempting to value some of the Duncans' assets and going at it alone without the help of these trained experts, he made several egregious mistakes, two of which I would like to highlight for this board. One is in his disregard for discounts in valuing the partnership interests held by the Duncans. As this court held in its 2012 decision in Keller v. United States, discounts are appropriate in valuing partnership interests to reflect the fact that a partnership interest lacks marketability, and in the case of a minority-held interest, of which the Duncans held several, there's a lack of control, and both of those components affect value. The second big mistake, I would say egregious mistake, that the settlement officer made in attempting to put value on the Duncans' assets is his treatment of related party transactions. We see this play out in how the settlement officer approached RCD investments, which is one of the entities that the Duncans held approximately 20% interest in. In valuing the assets of that partnership, he disregarded $19 million of debt simply because the creditor was a related party. As this court has held in its 2004 decision of Kimball v. United States, simply because of transactions between related parties is not a basis to disregard that transaction, or otherwise treat it as not bona fide. Now, adding insult to injury, the settlement officer Taylor then proceeded in a very whipsaw fashion to regard or respect $6 or $7 million of assets that were a note receivable to a related party. So on the one hand, when he's valuing RCD investments, he's disregarding $19 million of related party debt, and yet regarding and respecting approximately $7 million of assets. And by virtue of this approach, he assigned a $10 million value to RCD investments, when in fact the balance sheet showed that the entity was completely underwater. So when we are evaluating the settlement officer's conduct in this case, and we see that he failed to determine exactly what the Duncans could afford to pay in connection with evaluating their offering compromise, which was based upon collectability. We see his failure to seek out trained experts at the IRS based upon conclusions that he believed that it was obvious that they could fully afford to pay their taxes. And as a result, mishandled significantly valuing of certain assets of the Duncans. And then we see him considering dissipated assets, again in violation of Internal Revenue Manual procedures, failing to identify specific assets, and just using a plug value, it becomes clear that the settlement officer in this case abused his discretion in determining the offer and compromise submitted by the Duncans. Thank you, Mr. Didino. You've saved time for rebuttal. Yes. Ms. Wong? Good morning, Your Honors. Cheryl Wong for the Commissioner. Thank you. There is no case that we know of, and including the cases cited by the taxpayers in their brief, that a violation of the Internal Revenue Manual is per se an abuse of discretion. And that is assuming, for the sake of argument, that the IRS officer here failed to follow the Internal Revenue Manual. Taxpayers here also did not show that any of these violations had made a difference in their ability to pay or in their lack of special circumstances. And this is an offer with dealt as to collectability with special circumstances. And under the Revenue Procedure 2003-71, you have to have either economic hardship or some sort of public policy equity in order to constitute special circumstances. The taxpayers did not assert either. And when you look at the bigger, simpler items, the big picture, you've got a liability that's about $3 million by the time of the offer, and admitted undisputed asset ability to pay of $545,000. You've got these huge insurance policies that were never cashed out even in part for years and years to pay the tax liability of six figures in a brokerage account, and another six figures taken out in the first months of that offer to fund the operating expenses of a company. You've got the $8 million estate, and we don't really know where that went. We've got a home that's paid off. We've got jewelry that's substantial. Taken all together, the IRS acted within its discretion to reject the taxpayer's offer. And here, I want to take a little detour to address the quote-unquote two-pronged offer that their first offer was $40,000, and then their alternative offer was $545,000. The taxpayers never raised this argument in the tax court or in their opening brief. They didn't bring this up until we emphasized that $545,000 figure in our answering brief. That is really not our understanding of the record, that they made these two separate offers. That should be made clear under tab 4 and tab 6 of the supplemental excerpts of record that we included with our submission. So you're saying they never offered $545,000? That is not our understanding of the record, Your Honor. To address the specific issues in the manual, in the supposed violations of the manual, it is true that the reasonable collection potential, the RCP, appears in a lot of places as the starting point of the consideration of an offer. But nowhere in the manual does it say that you have to, you have to calculate this figure down to the dollar, down to the cent, especially when, as in this case, the information, it was kind of like pulling teeth to get the taxpayers to get them the information. The taxpayers, I think, mentioned four entity interests in their initial submission, and then when the IRS officer asked, well, what about these other entities that I think you might or might not have a connection with, then they came and gave more information about those entities, some of which have positive values, as shown by their appraisals in the end, like Duncan 60 Ranch, like Eden Road. So that's one thing. The second thing is the values are uncertain, partly because of the related party transactions and also because some of the information just doesn't reconcile. In the appraisals that the taxpayers submitted in October of 2014, there was a building that Mrs. Duncan was paying on because there was a loan on it. That was worth $800,000, that building. But in the submissions dated March of 2014, that building was valued at $2 million in the space of a few months, and the liabilities on that building were taken into account in a separate column, so it wasn't because of that. As far as the related party transactions, it is true. They are not per se discounted, but an officer acted within his discretion in kind of discounting that a little bit because, well, you don't know how much tea those notes have. What's the relationship between the parties? Have they ever been sued on? Have payments been made on them? Those notes, that kind of record is not in the record in front of the IRS officer. As far as the discount for control, that is another thing. If you go through the appraisals and you can see who owns them, most of those entities were owned by apparently family. For example, in Duncan Holdings, they were owned 99% directly by the taxpayers and about 1% by a management company controlled by Mrs. Duncan. So take a 15% discount for lack of control on that company. It doesn't make sense. You can see that in the rest of the entities as well. On that point, I think it's important to keep in mind that this is an informal process. Because the IRS officer doesn't have discovery powers, he can't call in the appraiser and cross-examine him. He has to use his judgment and ask himself, does this make sense or not? And going back to the points that I made earlier about the big ticket items, he says, well, okay, I don't think this is worth going any further just on those. And in fact, he really gave the taxpayers a better shot than they would have gotten by going through this due diligence. And this you can see in Exhibit 127 where there were handwritten notes. And I realized that it would have been a lot easier for the court if he had written a great narrative, but he did the work there. And that was not totally undocumented. And as far as the dissipated assets, the Internal Revenue Manual does set some guidelines as to when you should include those dissipated assets. And he did include, and I think the taxpayers mentioned in a brief that the cutoff is usually three years before the offer. And he did that with respect to the loan payments on the insurance policy. You can see in, I think, Exhibit 119 in the chart there that he set since 2011. He did that with the six figures taken out from the brokerage account to fund the operating expenses of the company. And as far as the assets, he actually didn't include the whole $8 million. If you look at the chart again in Exhibit, I'm sorry, and eventually in late October of 2014, the end figure that he came up with as close as he could get to RCP was about $3.174 million, and that obviously didn't include the $8 million. So that's one thing. And even if he had included that or part of that, it wouldn't be contrary to the revenue procedure. That takes into account amounts that the government can collect in the future through administrative or judicial means, and that makes sense. I mean, if you can collect from somebody else and credit it to her account, why should you give somebody a $3 million write-off right now? Right. And so that would be all the points that I plan to make today, but if the Court has further questions. All right, thank you, Ms. Wong. Thank you. Mr. Didino, you've saved time for rebuttal. So counsel for the government stated that they're not aware of any case where the Court found the lack of adherence to the Internal Revenue Manual procedures and standards of conduct was an abuse of discretion. There is one case I'd like to bring to the Court's attention, and that is Fairland v. Commissioner. Well, I think what I heard her say was that there's no case that says it is per se or automatically an abuse of discretion, not that it could never be abuse of discretion under the facts of the case. But anyway, go ahead. The site for that case would be TC Memorandum 2010-22. Government counsel also referenced the insurance policies, which there was some dissipated assets that were considered in connection with the insurance policies. A settlement officer looked at approximately three or four years back worth of loans that had been taken out of the policies, but then immediately reinvested in the policies to pay premiums to keep the policies alive. What's interesting here is that those policies were declared assets and formed part of the $545,000 that the Duncans had set forth that they could afford to pay. And so it's ironic that the IRS would be using, essentially, assets that were the loans that they were acts of asset preservation to keep the policies in place and treat them as acts of dissipation. And, in fact, the Internal Revenue Manual warns that this kind of results in the double count of value and should not be undertaken. I keep hearing this $8 million figure, and it was a figure that settlement officer Taylor had identified in its state inventory I referenced earlier. The tax court latched onto it. The government continues to talk about this $8 million value for the estate. When you look at Exhibit 113 and you look at the estate inventory, it makes clear that it's identifying the assets of the estate and it lists claims due and owing to the estate. It does not purport to identify claims due and owing by the estate. There were debts encumbering the estate, and we see that in the Form 706 that was filed with the Internal Revenue Service and formed part of the record in this case, Exhibit 13. Government counsel also said it was appropriate or within the settlement officer's discretion to disregard certain related party transactions, in particular the $19 million of related party debt. I would say that on a blanket basis, this court's precedent says that's not proper, that further inquiry needs to be made as to the bona fides of the transaction. Further, we only need to look at his treatment of related parties and including those as assets to say that this is misconduct. You can't disregard related party transactions where it suits the government's interests and then regard them, again, where it suits the government's interests, that there's a disparity between the treatment there. Lastly, there was some discussion about the consideration of this potential lawsuit where the government might be able to collect part of the debts from a co-executor of the estate. This has been a very confusing issue. I think the settlement officer was even confused on it because the government's ability to collect these taxes from another party, it doesn't make sense that that would be treated or should be treated as an asset of the Duncans. In fact, settlement officer Taylor testified that he wasn't sure whether it would be considered an asset, simply that it could be. Finally, with respect to the $545,000, it's true that the Duncans submitted an offer of $545,000 with a request for special circumstances of only $40,000. But if you looked at the offer paperwork, if you looked at what is required of a taxpayer in submitting an offer in compromise, there's no separate set of forms for an offer with special circumstances. It's virtually the identical submission. Ms. Wong says that there are only two situations in which special circumstances are allowed and that you didn't establish either one of those here. Is that right? There was a determination of special circumstances, Your Honor. What we're focused on is the IRS's evaluation of the underlining component of the Duncans offer in compromise, which is the $545,000. And it's clear that the IRS was following the Internal Revenue Manual in evaluating the $545,000 offer because all the due diligence and inquiries made by the settlement officer were designed to try to calculate the Duncans' ability to pay. Unless there's further questions. Counsel, I take it that there has been no effort in your interest or possibility of increasing your $40,000 offer. We contend, Your Honor, that an offer of $545,000 was on the table for them to consider. And as virtue of the offer in compromise that was submitted, in Section 8 of the Form 433A, it states, What is your minimum offer? And what is calculated there is $545,000, so that was before the Internal Revenue Service. Also, I would say that the provision or the opportunity to amend the offer, there was testimony that they had asked whether they'd be willing to increase their offer. However, that was illusory because in the same conversation, the settlement officer stated that he did not believe any offer would work. Thank you. All right. Thank you, Mr. Todino. Your case is under submission.